# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

JASON BOGE,

        Plaintiff,

vs.

DEERE & COMPANY,

        Defendant.

No. 22-CV-2074-CJW-KEM

**MEMORANDUM OPINION
AND ORDER**

_____

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................. 3

II.     FACTUAL BACKGROUND ............................................................ 3

     A.     Plaintiff's Application to Defendant and Mental Health History ............ 3

     B.     Plaintiff's Training ................................................................. 5

     C.     Plaintiff's Complaints to Supervisor and Union Representative ............ 7

     D.     Plaintiff's Compliance Complaints, Suspension and Termination ......... 10

          1.     October 6, 2021 ........................................................... 10

          2.     October 7, 2021 ........................................................... 13

          3.     October 8, 2021 ........................................................... 16

          4.     October 9–10, 2021 ...................................................... 18

1

          5.      October 11, 2021 ..................................................................20

   E.    Plaintiff's October 25, 2021, OSHA Complaint .............................20

   F.    Additional Undisputed Facts .....................................................21

III.    PROCEDURAL BACKGROUND ....................................................21

IV.    APPLICABLE LAW ..................................................................22

   A.    Summary Judgment ...............................................................22

   B.    Iowa Civil Rights Act Claims ...................................................24

V.    ANALYSIS.............................................................................34

   A.    Count I: Disability Discrimination in Violation of ICRA ..................35

   B.    Count II: Harassment in Violation of ICRA .................................40

   C.    Count III: Retaliation in Violation of ICRA .................................44

   D.    Count IV: Retaliation in Violation of Public Policy.........................50

VI.    CONCLUSION........................................................................53

# I.    INTRODUCTION

This matter is before the Court on defendant's motion for summary judgment. (Doc. 26).  Plaintiff timely filed a resistance.  (Doc. 29).  Defendant timely filed a reply. (Doc. 30).  For the following reasons, the Court **grants** defendant's motion for summary judgment on all counts.

# II.    FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted and are derived from the parties' respective statements of material facts and corresponding responses.  (Docs. 27-1; 29-2; 29-3; 30-1).  The Court will consider additional record materials as they become relevant to the Court's analysis.

## A.    *Plaintiff's Application to Defendant and Mental Health History*

Defendant operates an industrial facility in Black Hawk County, Iowa referred to as Waterloo Works where defendant manufactures, among other things, machine engines. In July of 2021, plaintiff appeared at defendant's job fair and applied for a job.  The same day, defendant hired plaintiff as a probationary labor pool employee at Waterloo Works within the Engine Works department.

Prior to his first day of work, plaintiff completed a "Voluntary Self-Identification of Disability" form provided by defendant.  On this form, plaintiff checked a box which stated, "Yes, I Have A Disability, Or Have A History/Record of Having A Disability." (*See* Doc. 27-3, at 23).  The voluntary self-identification form did not ask plaintiff to identify, nor did plaintiff state, the nature of his disability or whether plaintiff claimed to still have that disability.  The parties do not dispute that beyond this form, during the course of his employment, plaintiff never advised defendant that he suffered from any particular disability, nor did he ever specify whether his reported disability was physical or mental.  Defendant also never engaged in any interactive process with plaintiff about his reported disability.

Although plaintiff did not reveal the specific nature of his disability to defendant, plaintiff currently identifies his disabilities as Unspecified Mood Disorder and Post-Traumatic Stress Disorder ("PTSD"). In plaintiff's deposition on August 8, 2023, he testified to a history of various instances of mental health treatments. Plaintiff testified that he was told by a therapist in 1987 or 1988 that he had adjustment disorder, which involves "having a hard time adjusting to new situations." (Doc. 27-2, at 18). He also described certain instances where he sought mental health treatment at an institution called Pathways in 2017 and at an institution called Elevate in 2020 or 2021, (*id.*, at 22–23), although Pathways has no records of his purported treatment (*see* Doc. 27-3, at 53). Plaintiff testified that he was first diagnosed with PTSD at Elevate in 2020 or 2021. (Doc. 27-2, at 22). He stated that he requested documentation of this diagnosis from Elevate prior to beginning his employment with defendant, but Elevate refused to provide him with paperwork at that time. (*Id.*, at 23).

Plaintiff testified that he again sought treatment at Elevate following the end of his employment with defendant to address mental and verbal abuse he experienced in defendant's workplace. (*See id.*); (*see also* Doc. 27-3, at 29–39 (containing intake documents from plaintiff's visit to Elevate on October 12, 2021, the day after he was fired)). Plaintiff also testified about another instance of seeking mental health treatment relating to "dealing with a bad situation with Hy-Vee" when he was working at a new job after his termination from defendant. (Doc. 27-2, at 22).

The only available documents asserting plaintiff suffered from Unspecified Mood Disorder and PTSD are dated from the year 2022. (*See* Doc. 27-3, at 24, 54–57). Concerning his more recent diagnoses and the nature of his mental health conditions, plaintiff's deposition contains the following exchange:

Q.    Did any of your past mental health conditions affect your ability to learn?
**A.    I believe so. I believe that I was undiagnosed correctly.**

4

Q.     What do you mean by that?

**A.     Meaning the health professionals missed their opportunity to diagnose me correctly.**

Q.     Have you been correctly diagnosed now?

**A.     I think so given the fact -- what I have learned.**

Q.     So, when you started at [defendant], you had not received this more accurate diagnosis?

**A.     Well, I hadn't shared about the effects of trauma at that point with any other therapist.  The thoughts kept ruminating in my mind, and I shared them with [Elevate therapist] Michelle McPoland.**

Q.     When would that have been?

**A.     In 2020, 2021.**

Q.     Were you ever informed by a health care provider that the mental health conditions you had affected your ability to learn?

**A.     Not outright.**

(Doc. 27-2, at 23).

### B.     *Plaintiff's Training*

On August 23, 2021, plaintiff began his employment and had several days of orientation where he received information about defendant's policies.  After this orientation, he began training within Engine Works.  Defendant assigned plaintiff the position and duties of Engine Test Operator, and plaintiff began to receive additional position-specific training within Engine Works.  Plaintiff's duties as an Engine Test Operator involved conducting engine performance tests in a team environment and working with engine control units ("ECUs") and various engine parts, including wire harness connectors involved in the assembly process.

When plaintiff first began in his role, he was initially trained by Corey Vick.  This training relationship, however, only lasted for sixteen days.  In a written declaration signed by Vick, Vick stated that plaintiff would "blow up" at various times throughout the workday and would not accept corrective feedback.  (*See* Doc. 27-3, at 60–61).  Vick stated he felt that plaintiff put others at risk because, according to Vick, plaintiff would "lose it" and throw ECUs around, sometimes risking destruction of company property.

5

Plaintiff, in his deposition, denied any such mishandling of equipment. (*See* Doc. 27-2, at 23). When asked about instances of discrimination and harassment, plaintiff had the following exchange describing his experiences with Vick:

> Q.    [A]re there any other incidents of discrimination that you did not just talk about within the last five minutes or so?
> **A.    Oh, I was told to get my head out of my ass.**
> Q.    Okay. And that would have been by?
> **A.    Corey Vick.**
> Q.    And how is that discrimination?
> **A.    Oh, I don't know if it's discrimination as much as it's just a bad work environment.**
> Q.    So the comment from Mr. Vick to get your head out of your ass, you're not necessarily putting that in the bucket of discrimination that you're complaining about. It may be something else.
> **A.    Correct. Correct. It's just a bad -- a bad work syndrome. A bad coworker syndrome.**
> . . .
> Q.    Okay. So let's move on to harassment. Are there any issues related to harassment during your time at [defendant]?
> **A.    Yeah. [Vick] stating, "Get your head out of your ass."**
> Q.    Okay. Anything else?
> **A.    [Vick] being a control freak. And hypocritical.**
> Q.    Okay. Anything else?
> **A.    Examples are he was able to work ahead down the line on the assembly line and put on --**
> Q.    And this is Mr. Vick?
> **A.    Yeah.**
> Q.    Okay.
> **A.    But he would not permit me to do that. So it was a double standard.**
> Q.    Okay. And that's the hypocritical part?
> **A.    Yes. Yes. Double standard, hypocritical.**

(*Id.*, at 14). At some point, Vick apologized to plaintiff. Yet, plaintiff felt that Vick was still "not nice" to him after the apology. Plaintiff, therefore, sought a new trainer.

6

Because plaintiff felt that he could no longer be trained by Vick, plaintiff confronted his supervisor, Dennis Ahern, about Vick. On October 4, 2021, plaintiff was then immediately switched to Jim Padilla for training. In a written declaration signed by Padilla, Padilla stated that while he was attempting to train plaintiff, plaintiff would instead order him around. (*See* Doc. 27-3, at 64). According to Padilla, plaintiff did not listen to feedback during training and, four to six times a day, would mishandle and throw engine parts around when he became frustrated. (As noted above, plaintiff denied ever mishandling equipment.) Padilla stated that plaintiff was not able to get along with other people, that plaintiff's behavior was escalating and becoming more aggravated, and that Padilla eventually did not feel it was safe for himself or others to be around plaintiff. Padilla stated that on or around October 6, 2021, he expressed his fears to Ahern and union steward Joe Wright that plaintiff was "a true safety threat."

### C. Plaintiff's Complaints to Supervisor and Union Representative

During the course of his training, plaintiff discussed with his supervisor, Ahern, that he would like to have certain wiring harnesses labeled, have allegedly defective tools replaced—namely, a handheld drill—and have a quality control computer system adjusted. Ahern, in response, told Padilla to take the drill and run the drill to show Ahern that it worked. Padilla did as much, reflecting no issues with the drill.

Ahern refused plaintiff's requests to label the wiring harnesses. In plaintiff's opinion, these denials constituted discrimination against him, as plaintiff viewed his requests to label the wiring harnesses as requests for reasonable accommodations for his disability. (*See* Doc. 27-2, at 13). Plaintiff's deposition testimony contains the following exchange about his requests to have the wiring harnesses labeled:

Q. This idea about labeling wiring harnesses . . ., what does that have to do with this disability that you claim you informed the company about?
**A. Oh. So that I could do my job. So that I can use the labels to plug into the correct connection.**

7

Q.      And that has to do with your disability how?

**A.      To make the job easier for the individual.  Because they weren't labeled.  They were frayed.  And it makes my job easier in order to do the work that is required of me to do.**

Q.      But how does your disability -- I'm just trying to figure out, how does that factor into whether or not there's a label on the wiring harness?

**A.      It enables me to do my job correctly. . ..**

Q.      So you mentioned that [Ahern] did not make a reasonable accommodation.

**A.      That's what I meant.  That's what I meant.**

Q.      And did you tell him, at the time, that because of a disability you need these labels?

**A.      I did not tell him that.  But the company knew when I applied for the job that I had checked, yes, I do have a disability.  That is on their application and you check the box.  So, yes, I did do that.**

**        So, if they didn't inform [Ahren], you know, that's their -- what HR knows should go to the company as well.**

(*Id.*).  Plaintiff testified that Ahern yelled at him, "We're not going to change the world for you, [plaintiff]," in response to his requests to have the wiring harnesses labeled.  The parties agree that plaintiff never told Ahern that any requests were due to a disability.  Plaintiff maintains, however, that Ahern, and everyone else employed by defendant, should have known that all his requests were requests for reasonable accommodations for a disability because plaintiff had, upon applying for the job, checked the box on the "Voluntary Self-Identification of Disability" form indicating that he had, or previously had, some sort of unspecified disability.  (*See* Docs. 27-1, at 9; 29-2, at 5).

Plaintiff also reported concerns to Ahern about the "AMES" computer system that defendant uses to ensure quality control.  Plaintiff requested adjustments to the system, but the parties agree that plaintiff made these requests so that he could "do his job," not to accommodate plaintiff's purported disability.

In addition to the various requests and complaints plaintiff brought to Ahren, plaintiff further voiced his concerns about the labeling of wiring harnesses and labeling

of "other areas" to Vick, Padilla, and another employee at defendant who was plaintiff's union representative, Christine Weber. (*See* Doc. 27-2, at 17). At plaintiff's request, Weber visited plaintiff's worksite to see where plaintiff had requested labeling. In a written declaration signed by Weber, Weber described several of her encounters with plaintiff. (*See* Doc. 27-3, at 58–59). Weber stated that she sometimes spoke to plaintiff with another union representative, Austin McAhren. Weber stated that when plaintiff interacted with McAhren, plaintiff was confrontational and accusatory. Weber also stated that plaintiff would frequently say to her, "I am holding you accountable," as though he were holding Weber personally accountable for his job security. Weber stated that plaintiff made her feel unsafe and that she was worried his behavior would turn violent. Weber recounted talking to plaintiff about putting labels on certain test hoses on October 4 and 5, 2021, and "at that time, [she] was relieved because [she] believed all was fine."

Beyond the foregoing accounts of plaintiff's various requests and complaints, plaintiff testified that he also reported a coworker for safety concerns. Plaintiff testified that he, at some point, reported Vick for bypassing safety switches on the engine assembly line. (Doc. 27-2, at 13, 17). According to plaintiff, each station on the assembly line had a stage where a switch would cause the engine to come to a stop. Plaintiff testified that Vick would bypass certain safety switches to prevent the engines from coming to a stop, which meant plaintiff had to "do things on the fly." Plaintiff testified that he asked Vick to stop "bypassing" until plaintiff became acclimated with his training, and that plaintiff was concerned about being hit by an engine. Plaintiff testified that Vick's response to plaintiff was, "Oh, just be careful and look out for it." (*See* Doc. 29-4, at 3). Plaintiff testified that despite his requests, "there was no concern" about the ongoing bypassing process, and that because of this, he was almost hit with an engine. (*See id*; Doc. 27-2, at 17).

### D.      Plaintiff's Compliance Complaints, Suspension and Termination

The timeline of relevant events becomes somewhat dense after the date of October 5, 2021.  The Court will proceed by setting forth in chronological fashion a picture of the parties' undisputed facts combined with various accounts of events reflected in the record, beginning with the date of October 6, 2021.

### 1.      October 6, 2021

Plaintiff's union representative, Weber, stated in her declaration that on October 6, 2021, plaintiff pulled her aside, got in her face, and yelled at her.  (*See* Doc. 27-3, at 59).  The parties agree that plaintiff accused Weber for not getting labels made, stating "nothing is labeled out there" and that he could not do his job because of her.  (*See* Docs. 27-1, at 10; 29-2, at 6).  The parties also agree that plaintiff asserted to Weber that he did not trust the union and that he experienced similar treatment at other jobs where he was fired for his behavior because people did not want to train him.

Plaintiff testified in his deposition that he had voiced some of his concerns to various union representatives, but that he was "their lowest priority."  (*See* Doc. 27-2, at 25).  Plaintiff testified that he "played a lot of phone tag" with the union and eventually, plaintiff "just drove out [to the union hall]."  Plaintiff explained that "instead of just being avoided, [he] went out and faced [the union representatives]."  Plaintiff's account of his visit to the union hall appears to coincide with the date of October 6, 2021, reflected by an internal investigation report prepared by defendant which stated that "[union] leadership stated . . . that [plaintiff] showed up to the [union] hall and became very upset that the [h]all wasn't opened up."  (*See* Doc. 27-2, at 50).

Union committeeman Mark Skillings stated in a written declaration that he and fellow union committeeman Matt Hovey experienced a "confrontational conversation"

with plaintiff on October 6, 2021.[1]  (*See* Doc. 27-3, at 66–67).  According to Skillings, the conversation pertained to an incident reported to have occurred at the union hall on October 6 "where [plaintiff] showed up and became very upset that the [h]all wasn't opened."  Skillings stated that "[w]hile [he] attempted to explain that [plaintiff] would need to have some patience in response time for non-urgent requests, [plaintiff] would continually interrupt the conversation."  According to Skillings, these interruptions "led to a heated conversation and curse words were exchanged between [himself] and [plaintiff]."  At this point, according to Skillings, Hovey stepped in and put a stop to the conversation, told them that this was unprofessional behavior, and made Skillings and plaintiff apologize for swearing.  Skillings stated that this interaction "was typical of interactions with [plaintiff] who was argumentative about everything."

In a written declaration signed by Hovey, Hovey recounted an identical conversation he and Skillings had with plaintiff pertaining to an incident at the union hall on October 6, 2021, where plaintiff was upset because the hall was closed and nobody from the union had responded to his questions.  (*See id.*, at 68–69).  Hovey stated that plaintiff's interruptions "led to a heated conversation and curse words were exchanged between [plaintiff] and Skillings."  Hovey recounted that he "stopped the conversation, stated that this was unprofessional behavior and made both [Skillings] and [plaintiff] apologize for swearing."  Hovey stated that in his interactions with plaintiff, "[plaintiff] was argumentative and confrontational about everything."

As noted above, Padilla—the second individual who attempted to train plaintiff at Engine Works—stated in his declaration that on or around October 6, 2021, he expressed

---

[1] Although Skillings states the conversation occurred on October 6, 2021, it is somewhat unclear from the record whether Skillings and Hovey's conversation with plaintiff occurred on October 6—the same day as plaintiff's visit to the union hall—or the following day, October 7.  (*Compare*. Docs. 27-1, at 11 *and* 27-2, at 50 *with* 27-3, at 66, 68 *and* 29-2, at 7).

his fears to supervisor Dennis Ahern and union steward Joe Wright that plaintiff was "a true safety threat."

On the night of October 6, and into the early morning of October 7, plaintiff called defendant's Compliance Hotline phone number. (*See* Doc. 27-2, at 56–58). During his initial call, plaintiff alleged that he was being harassed by Ahern and Vick and that this harassment has been "ongoing since September 13, 2021." Plaintiff described the issues as Vick "talk[ing] down to [plaintiff] in a degrading and defaming manner," specifically when Vick commented that plaintiff should "get his head out of his ass" and when Vick asked plaintiff if he "want[ed] [Vick] to hold his hand." Plaintiff described that Vick apologized to him, but that Vick "could not take away what was said" because Vick's "actions were condescending." Plaintiff also alleged that Ahern "did not witness [plaintiff] work for the first time until October 6." Plaintiff further alleged that the AMES computer system was "obsolete and not user friendly" because plaintiff could not get it to work. Plaintiff blamed the system for "slow[ing] people down."

Plaintiff also alleged during his initial Hotline call that Ahern did "not want to fix anything or label any of the wiring harnesses." Plaintiff alleged that "the system does not function well at all, has a lot of issues, and slows people down." Plaintiff explained that he reported his request for labeling things to Weber and that Weber "was going to help label things to create a more comfortable environment and make it a more user-friendly atmosphere." Plaintiff alleged that, after he made this report to Weber, Ahern "yelled at [plaintiff] and told him that he was not going to change the world for [him]." Plaintiff also alleged that "the tools [were] defective," that the tools did not work properly, and that the employees needed "better tools if [Ahern] wants them to perform at maximum performance." Plaintiff closed his October 6 complaint by noting that he "fear[ed] retaliation" because Ahern was "very closed-minded whenever [plaintiff] tried to offer suggestions."

### 2. October 7, 2021

Plaintiff testified that on the morning of October 7, 2021, there was a safety meeting at work. (*See* Doc. 27-2, at 26). Ahern held the meeting, and plaintiff's entire group was in attendance. (*See* Docs. 27-1, at 21; 29-2, at 13). At the meeting, Ahern announced that the previous night, October 6, someone had been hit by an engine and went to the emergency room for treatment. (*See* Doc. 27-2, at 24, 26). Ahern cautioned the employees "[t]o watch out for the engines moving down the assembly line . . . and to be aware of your surroundings." (Docs. 27-1, at 21 (alterations in original); 29-2, at 13). Plaintiff does not know who the individual was that was hit by the engine and does not know anything else about the circumstances surrounding the safety warning that his team received.

Plaintiff also testified that on that same morning, plaintiff came from the break room and encountered Ahern, and Ahern told him, "If you're ever two minutes late again, I'm going to write you up." According to plaintiff, this was the only time he was ever late from break. (*See* Doc. 27-2, at 18).

During the afternoon of October 7, plaintiff was suspended from work. Plaintiff's deposition testimony reflects the following details about how the suspension unfolded:

> Q. Tell me about the meeting where you were informed you were going to be suspended.
> **A. Oh, it was after lunch. Basically, two people showed up and walked me out, wouldn't let me change my diesel fuel clothing, and -- Andy and another guy. I forget his name. And that was about it. I questioned them why I couldn't change my clothes and they didn't care. They just wanted me out.**
> Q. Did they say anything other than --
> **A. "You're on suspension." Yeah. "Give me your badge."**
> Q. Do you recall, did they say anything about why or what was going on?
> **A. Just an investigation. But they weren't nice. They were not nice. They were -- they were mean-spirited.**

(*Id.*, at 27).

Defendant's internal investigation report similarly reflects that plaintiff was informed on October 7, 2021, that his suspension related to an ongoing investigation. Defendant's report stated as follows:

> Andrew, [plaintiff], and Eric arrived in the test cell break area after retrieving [plaintiff's] things and Andrew told [plaintiff], "[Plaintiff], it was brought to our attention by numerous employees that your behavior has raised concerns on the shop floor and at this time you are being suspended for this behavior until we can investigate into this further." [Plaintiff] stated that he put in a call last night regarding the union, at which point Andrew reiterated that you are being suspended due to your unprofessional behavior. Andrew said, grab your things. [Plaintiff] stated multiple times in the short walk from the break area to the East gate, "Do you know what it is like to be treated unfairly." Andrew asked for [plaintiff's] badge which he had to get out of his wallet. [Plaintiff] asked Andrew when he would respond back to let him know about the investigation. Andrew stated, I will get back to you in the next day or two. As [plaintiff] left the turnstile, [plaintiff] stated he would get back paid while he was out. Andrew stated, I will get back to you in a day or two.

(Doc. 27-2, at 52).

Directly after being escorted out of the Engine Works building on October 7, plaintiff went to the union hall "to complain that he was suspended pending investigation." (Docs. 27-1, at 14; 29-2, at 9). At the union hall, plaintiff requested to have counseling services. Defendant immediately set up an appointment for plaintiff later in the month to see a counselor through defendant's employee assistance program. Plaintiff testified that he also placed a call to the Occupational Safety and Health Administration ("OSHA") from the union hall. (Doc. 27-2, at 27).

In her declaration, Weber stated that when plaintiff arrived at the union hall that day, she "felt so unsafe that [she] was scared to interact with [plaintiff] again and [she] asked several [union] personnel to accompany [her] to walk into the union hall and out

to [her] car" because Weber felt that plaintiff "could fly off the handle at any time." (Doc. 27-3, at 59).

In defendant's internal investigation report concerning plaintiff, defendant purports to have interviewed seven people as part of its investigation: Matt Hovey (union committeeman), Joe Wright (union steward), Corey Vick (coworker), Jim Padilla (coworker), Christine Weber (union representative), Shawn Stone (union chairman), and Rita Pillard (nurse). (*See* Doc. 27-2, at 50–53). Defendant's report states that Hovey, Wright, Vick, Padilla, and Weber were all interviewed on October 7, 2021.[2] Each of these interviews generally reflects an account by the respective individual concerning plaintiff and his behavior.

Plaintiff attempted to call defendant's Compliance Hotline number again on October 7, 2021, and the call dropped multiple times. (Docs. 27-1, at 16; 29-2, at 10; *see also* Doc. 27-2, at 54).

_____

[2] The same report also states that on October 9, 2021, an anonymous employee submitted a compliance case alleging a policy violation due to plaintiff's actions at work. Plaintiff asserts throughout his pleadings that because the anonymous complaint was lodged on October 9, it is inconceivable that defendant could have commenced an investigation into plaintiff prior to October 9 and that defendant could have conducted interviews concerning plaintiff's behavior prior to October 9. (*See* Docs. 29-1, at 4, 10–11; 29-2, at 8, 11). Plaintiff insists that the October 9 complaint (noted by defendant in defendant's investigation report—the same report containing the purported October 7 interviews) was what *launched* defendant's investigation into plaintiff's actions, including any interviews related to plaintiff (Doc. 29-1, at 11), even though the report does not state that this was the case. Despite plaintiff's position here in which he insinuates that defendant falsely backdated the interviews to have occurred on October 7 when they actually occurred after October 9, plaintiff elsewhere throughout the record appears to have been aware that an investigation into him was already ongoing by October 7. For instance, plaintiff testified that he was told by the two men escorting him out of work on October 7 that he was being investigated, (Doc. 27-2, at 27), and plaintiff went to the union hall that same day "to complain that he was being suspended pending investigation," (Docs. 27-1, at 14; 29-2, at 9). The Court notes, however, that the interview of Stone, dated October 7 in defendant's report, recounts events that the parties agree took place on October 8.

### 3. October 8, 2021

Plaintiff again called defendant's Compliance Hotline multiple times on October 8, 2021. (*See* Doc. 27-2, at 54). In his first October 8 call, which was at 12:22 AM, plaintiff made several statements and allegations. Plaintiff alleged that he "has attempted to add follow-up information 4 times on October 7, 2021, and he was disconnected numerous times." Plaintiff stated that he feared "he may have been hacked and that his devices are compromised, as someone may be intentionally trying to prevent him from reporting." Plaintiff reported that he told Ahern after a meeting on October 7 that he had "filed a report through the ethics line against [Ahern] because of [Ahern's] behavior," apparently referring to his Hotline call the night of October 6. Plaintiff alleged that Ahern responded by talking to plaintiff about his taking breaks during production time. Plaintiff then complained during the October 8 Hotline call that employees were "not properly trained on mistake-proofing through AMES" and that trainers like Jim Padilla were "never using AMES or mistake-proofing." Plaintiff also alleged that mistake proofing was not used "even when operating gas lines." Plaintiff further complained that he was escorted off the premises on October 7 and that he was suspended pending an investigation. Plaintiff ended the call by asserting it was not right "for him to be terminated for telling the truth about the 'nightmarish training'" he received.[3]

Defendant's internal record of plaintiff's Hotline calls asserts that, during the first October 8 Hotline call, plaintiff explained that on October 7, "[he] was told that he was being suspended due to 'behavioral reasons' and that 'numerous people' had complained about him." The Hotline record asserts that plaintiff said that "[t]his is a lie" and that plaintiff claimed that he "is being directly targeted because he is whistleblowing on the

---

[3] Plaintiff testified at his deposition, however, that he felt he "mastered every task" in his role at defendant and felt there was nothing from his training he could not do. (*See* Doc. 27-2, at 20).

negligence on-site and believes that the people making reports against him for his 'behavior' are possibly being blackmailed."

Later in the morning of October 8, 2021, plaintiff appeared at the union hall to request a "summary of changes" packet relating to an upcoming union contract. Employees there were confused, however, about whether plaintiff was allowed to have a summary packet based on his suspended status. Plaintiff then took a phone call and stated that he had to take it because it was from OSHA.

The record contains pages from an Iowa Workforce Development file which reflect that the Department of Labor National Contact Center ("DOL-NCC") received an OSHA-related concern from plaintiff at 8:54 AM on October 8, 2021. (*See* Doc. 29-4, at 6–7). The DOL-NCC appears to have called plaintiff back that same morning. The DOL-NCC noted the following about the callback:

> Spoke with [plaintiff] to verify the reasoning of his call and he [sic] filing a complaint. He stated that Union Representative Jim Padilla is falsifying safety records on the AMES System and [Padilla] is stating that the cap on the fuel lines are being torqued and they aren't. The caller also stated that he was verbally abused by another union representative and the caller wants to invoke his whistleblower rights.

(*Id.*).

While plaintiff was at the union hall, other employees attempted to explain things to plaintiff, but he would not listen. Plaintiff was eventually escorted off the property.

The same morning of October 8, 2021, around 9:30 AM, plaintiff called Rita Pillard, a nurse employed by defendant. Plaintiff was agitated and speaking in a rushed manner to Pillard that he had "turned in" others employed by defendant, but plaintiff did not specify who he turned in or for what. Pillard attempted to get more information as to why plaintiff was calling medical about this issue. Plaintiff alleged that he was told to call medical and to have "this" documented, but he did not explain who told him to do so. When Pillard advised that she only documented medical information and not

17

discipline issues, plaintiff then asked for Pillard's first and last name.  In defendant's internal investigation report, Pillard stated that she gave plaintiff her first and last name but then immediately regretted doing so because she felt that plaintiff "was not a person [whom] I wanted to have that information as he seemed unstable and made me feel uncomfortable."  (Doc. 27-2, at 52).  Pillard stated that she was able to get plaintiff to answer a few questions about his history of "mental problems" and whether he was being followed by a physician or taking any medications.  Pillard stated that plaintiff then proceeded to talk about being "walked" out of the plant by two people the previous day. Plaintiff then asked for the names and phone numbers of other employees of defendant. Pillard stated that she "did not give that information [to plaintiff] as [she] was feeling very uncomfortable by then with the conversation."  According to Pillard, "[plaintiff] kept talking nonstop about all of the above topics until finally . . . it seemed just impossible to get him to understand medical's position on what would be documented and the limits of medical's involvement in his issues."  At this point, Pillard disconnected the call.  Defendant's report states that after the incident with Pillard, a security alert was issued.

### 4.  October 9–10, 2021

Plaintiff asserts that on Saturday, October 9, 2021, he was notified that his employment was terminated, effective Monday, October 11, 2021.  (Doc. 30-1, at 4). To support this assertion, plaintiff points to his deposition testimony in which he states the following: "[T]he night that I reported my concerns to [defendant's Compliance Hotline], the next day I was suspended and then three days later was fired."  (Doc. 27-2, at 14).  The parties agree, however, that plaintiff made his first Hotline call the night of October 6 and that he was suspended on October 7.  So, "three days later" from the day plaintiff was suspended (October 7) would be Sunday, October 10.  Thus, the Court

finds that plaintiff's assertion about his notice of termination on October 9, 2021, is not supported by the record.

On October 9, 2021, plaintiff made at least three different Compliance Hotline reports to provide additional information. (*See* Doc. 27-2, at 58). Plaintiff's additions included clarifying that he was speaking about Vick in his prior reports and that Padilla, while using the AMES system, "falsifies records by tripping the [wrench] on his legs or thighs."

As noted above, defendant's internal investigation report states that on October 9, 2021, an anonymous employee submitted a compliance case alleging a policy violation due to plaintiff's actions at work. (*See* Doc. 27-2, at 50). The anonymous employee provided that they were a wage employee who was tasked with "breaking in" plaintiff. The employee provided that plaintiff denied making mistakes, which caused "temporary disruption in production and [defendant's] mistake proofing being turned off." Along with indicating concern that plaintiff's rough handling of engine parts could have resulted in "much more damage than it did," the employee stated that their "safety was in jeopardy" because they felt they had to watch their back while working with plaintiff.

At some point on either Saturday, October 9, or Sunday, October 10, 2021, plaintiff attended a union meeting on the premises of the University of Northern Iowa. (*See* Doc. 27-2, at 28 (containing plaintiff's deposition testimony that he attended the union meeting the weekend before he was fired)). At the union meeting, plaintiff "got on the microphone and spoke in front of everybody." Plaintiff testified that afterward, he wanted to speak again, but he was denied access to the microphone because, in his view, "they knew I was touching topics that were hot buttons that were good ideas to help newbies."

### 5. *October 11, 2021*

On October 11, 2021, defendant concluded its investigation of plaintiff, and determined that plaintiff, who remained at that point a probationary employee, was to be terminated. Defendant's internal investigation report states that defendant determined that plaintiff "displayed threatening and intimidating behavior on several occasions" which was both verbally and physically aggressive and intimidating to his coworkers. (*See* Doc. 27-2, at 53). Defendant's report states that based on the number of employee complaints and concerns raised, defendant determined that plaintiff's behavior violated defendant's Code of Business Conduct as well as defendant's Global Workplace Violence Prevention Policy. (*See id.*). Defendant terminated plaintiff's probationary employment on October 11, 2021. Plaintiff's employment with defendant thus totaled approximately forty-nine days.

### E. *Plaintiff's October 25, 2021, OSHA Complaint*

On October 25, 2021, two weeks after plaintiff's termination, he filed a complaint with OSHA. (*See* Doc. 27-3, at 40–41). The OSHA file summarized plaintiff's allegations as follows:

> [Plaintiff] alleges he was suspended . . . and terminated . . . in retaliation for voicing workplace safety concerns, and filing an ethics complaint about those concerned, that included, but was not limited to, a concern with an employee being injured in ILS engines due to negligence, the manner in which a bypass was being used while he was on training where he could have been permanently injured, being provided with defective tools that did not work properly and a concern with the AMES System not being used to cap off operating gas lines.

(*Id.*, at 40). Plaintiff testified that he felt "disrespected" by OSHA and asserted that OSHA chose not to do anything about his complaints. Plaintiff testified that he spoke multiple times with an OSHA representative, but that the OSHA representative "didn't

do his job . . . [t]o [plaintiff's] satisfaction." In plaintiff's view, OSHA "covered up and didn't investigate."

Although plaintiff alleges that OSHA did not investigate, OSHA completed an investigation of his claims and determined that there was no reasonable cause to believe a violation occurred. (*See id.*, at 42–52).

### F.    *Additional Undisputed Facts*

The parties agree that in the last decade of employment, this is not the first time that plaintiff has alleged he was terminated after he allegedly found safety concerns that no one else saw. Plaintiff testified that he was "assertive" when his other managers "lied," and that he was "retaliated against," treated poorly, or "ambushed" with at least six other employers. Plaintiff understands that people think he is a threat because he is "such a big guy and . . . strong."

## III.    PROCEDURAL BACKGROUND

On December 1, 2022, plaintiff filed a four-count complaint in the Iowa District Court for Black Hawk County. (Doc. 1-1, at 3–8). In Count I, plaintiff alleges defendant discriminated against him by terminating him because of a diagnosed mental health condition in violation of the Iowa Civil Rights Act. (*Id.*, at 5). In Count II, plaintiff alleges that employees of defendant harassed him based on his disability in violation of the Iowa Civil Rights Act. (*Id.*). In Count III, plaintiff alleges that he reported the employees' discriminatory and harassing behavior to defendant's Compliance Hotline, that he was suspended from work the following day and fired several days later, and that defendant retaliated against him in violation of the Iowa Civil Rights Act because his report was a determining factor in defendant's decision to suspend and terminate him. (*Id.*, at 6–7). In Count IV, plaintiff alleges that defendant terminated him because he complained of unsafe working conditions, which constituted retaliation by defendant in violation of the public policy of the State of Iowa. (*Id.*, at 7–8).

On December 15, 2022, defendant timely removed the case to this Court based on diversity jurisdiction. (Doc. 1). On March 10, 2023, defendant timely filed an amended answer. (Doc. 14). On November 17, 2023, defendant filed its motion for summary judgment. (Doc. 26). On January 11, 2024, the Court heard oral argument on defendant's motion. (Doc. 32).

## IV. APPLICABLE LAW

### A. Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party has two options. *See* Fed. R. Civ. P. 56(c)(1). First, a party may support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Alternatively, a party may show that the materials cited fail to establish the presence or absence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). More specifically, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted), or "when 'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248)). Evidence that presents

only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it requires "a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex Corp.*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or other evidence designate specific facts showing that there is a genuine issue for trial. *See Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252 (1986).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587–88 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them") (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380

(2007)).  At this stage, a court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citing *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996)). Rather, a "court's function is to determine whether a dispute about a material fact is genuine." *Quick*, 90 F.3d at 1376–77.  In other words, in assessing a motion for summary judgment, a court must determine whether a fair-minded trier of fact could reasonably find for the nonmoving party based on the evidence presented. *Anderson*, 477 U.S. at 248; *Herring v. Can. Life Assurance Co.*, 207 F.3d 1026, 1030 (8th Cir. 2000).  When considering a motion for summary judgment, the court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

### B.    *Iowa Civil Rights Act Claims*

Chapter 216 of the Iowa Civil Rights Act ("ICRA") provides, in pertinent part:

(1.) It shall be an unfair or discriminatory practice for any:
(a) Person to . . . discharge any employee, or to otherwise discriminate in employment against . . . any employee because of the . . . disability of such . . . employee.

Iowa Code § 216.6 (2024).

The Iowa Supreme Court has iterated that, as a general principle, "civil rights cases brought under [the ICRA] will be 'guided by federal law' and 'federal cases.'" *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989) (quoting *King v. Iowa Civ. Rts. Comm'n*, 334 N.W.2d 598, 601 (Iowa 1983)); *see also Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 803 (Iowa 2003) ("Because the ICRA is modeled after the federal legislation, Iowa courts have traditionally looked to federal law for guidance in interpreting it."); *Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003) (explaining that in applying the ICRA's proscription against discrimination, Iowa courts "look[ ] to the corresponding federal statutes to help establish the framework to

24

analyze claims and otherwise apply [the ICRA]" (citation omitted)); *Mettner v. N. Nat. Gas Co.*, No. C94-2032, 1995 WL 17018699, at *7 (N.D. Iowa July 6, 1995) (applying the Iowa Supreme Court's "appl[ication of] federal law principles and analytical framework in civil rights cases brought pursuant to [the ICRA]" (citation omitted)). The Iowa Supreme Court has also indicated, however, that it is not bound by federal precedent. *See Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 271 (Iowa 2019) ("[W]hile federal courts' interpretations of the federal civil rights statute are illustrative and instructive, we are by no means bound by their construction when interpreting the ICRA. . . . We look also to other jurisdictions for guidance in interpreting the ICRA.") (citing *Hubbard v. State*, 163 N.W.2d 904, 909 (Iowa 1969)).

A plaintiff can prove discrimination under the ICRA by direct or indirect evidence.[4] *Hedlund v. State*, 930 N.W.2d 707, 715 (Iowa 2019). Under the Iowa Supreme Court's analytical framework used to prove discrimination on the direct evidence track, "[a]fter the direct evidence has been presented [by the plaintiff], the employer then bears the burden of establishing by a preponderance of the evidence it

---

[4] Direct evidence "'show[s] a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)). "Thus, 'direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Id.* Direct evidence "most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861 (8th Cir. 2009) (citation omitted); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–102 (2003) (rejecting the distinction between direct and indirect evidence to the extent that direct evidence is not required for a plaintiff to obtain a mixed-motive, *see infra* note 5, jury instruction when seeking to prove a prohibited characteristic was a "motivating factor for any employment practice" under the Civil Rights Act of 1991, 42 U.S.C. § 2000e–2(m)); *Hedlund v. State*, 930 N.W.2d 707, 733 (Iowa 2019) (Appel, J., concurring in part and dissenting in part) (collecting cases and noting that Iowa "long ago crossed the *Desert Palace* bridge rejecting the distinction between direct and indirect evidence").

would have made the same decision even in absence of the improper motive." *Vaughan v. Must, Inc.*, 542 N.W.2d 533, 538–39 (Iowa 1996) (citation omitted). Direct evidence of a discriminatory motive, however, "is rarely trumpeted by the employer and is almost never available." *Stansbury v. Sioux City Cmty. Sch. Dist.*, No. 21-0864, 2022 WL 2824284, at *4 (Iowa Ct. App. July 20, 2022) (citation omitted). Here, indeed, the Court does not find any facts in the record constituting direct evidence of discrimination, and the Court thus looks to Iowa law to determine how to proceed when the record contains only indirect evidence of discrimination.

On motions for summary judgment in ICRA discrimination claims resting on indirect evidence, the Iowa Supreme Court recently announced its adoption of a "modified" version of the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Feeback v. Swift Pork Co.*, 988 N.W.2d 340, 347 (Iowa 2023). The Iowa Supreme Court explained:

> We do so to align the summary judgment test with the mixed-motive causation standard[5] and the same-decision defense[6] at trial. Under our modified *McDonnell Douglas* test, employees must carry the initial burden of establishing a prima facie case of discrimination. Employees do so by showing that they are members of a protected group, were qualified for

---

[5] Under the mixed-motive causation standard, a plaintiff need only demonstrate that his or her status as a member of a protected class was *a motivating factor*—rather than the determining factor—in the employment decision, a standard first set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244 (1989) (plurality opinion), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat. 1071 (codified at 42 U.S.C. §§ 2000e–2(m), 2000e–5(g)(2)(B)). *See Hawkins*, 929 N.W.2d at 272 (reaffirming adoption of the *Price Waterhouse* motivating-factor standard for employment claims under the ICRA) (citing *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 634, 637 (Iowa 2017) (Appel, J., concurring in part and dissenting in part); *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 7 (Iowa 2009)).

[6] When the motivating-factor causal standard is applied, an employer can avoid liability "by proving by a preponderance of the evidence that it would have made the same decision even if it had not" accounted for the employee's protected characteristic. *Hawkins*, 929 N.W.2d at 272 (quoting *Price Waterhouse*, 490 U.S. at 258). This is known as the "same-decision defense." *See id.*

26

their positions, and the circumstances of their discharge raised an inference of discrimination. Then, the employer must articulate some legitimate, nondiscriminatory reason for its employment action.[7] At that point, the burden shifts back to the employee to demonstrate the employer's proffered reason is pretextual or, while true, was not the only reason for [their] termination and that [their protected trait] was another motivating factor.[8]

*Id.* at 347–48 (cleaned up). To summarize, the *Feeback* court adopted a three-step test. First, the employee must establish a prima facie case; second, the employer can rebut; and third, the employee can overcome the employer's rebuttal by demonstrating pretext. It is at step three that the *Feeback* court departed from *McDonnell Douglas*.

The *Feeback* court disposed of the *McDonnell Douglas* "determining factor" standard in favor of the "motivating factor" standard. *See id.* Iowa courts had previously

---

[7] When the plaintiff establishes a prima facie case, "a presumption of discrimination attaches." *Trobaugh v. Hy-Vee Food Stores, Inc.*, 392 N.W.2d 154, 156 (Iowa 1986) (citing *Iowa State Fairgrounds Sec. v. Iowa Civ. Rts. Comm'n*, 322 N.W.2d 293, 296 (Iowa 1982)). Although this presumption shifts the burden of *production* to the defendant, "[t]he burden of *persuasion* never shifts from the employee plaintiff." *Id.* (emphasis added). In this sense the presumption against the defendant raised by the plaintiff's prima facie showing operates like all presumptions, as described in Federal Rule of Evidence 301:

> In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally.

Fed. R. Evid. 301. When the defendant produces evidence that shows "some legitimate, nondiscriminatory reason" for the challenged action, "the presumption of discrimination drops from the case. . . . Thus, the employer does not have to convince the fact finder that it actually was motivated by the proffered reason." *Trobaugh*, 392 N.W.2d at 156–57 (internal quotation marks and citations omitted).

[8] The Iowa Supreme Court emphasized that when it comes to the plaintiff's ultimate burden of persuasion after the presumption of discrimination drops from the case, "[s]ummary judgment is not a dress rehearsal or practice run; 'it is the put up or shut up moment in a lawsuit, when a [nonmoving] party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Feeback*, 988 N.W.2d at 348 (alteration in original) (quoting *Slaughter v. Des Moines Univ. Coll. Of Osteopathic Med.*, 925 N.W.2d 793, 808 (Iowa 2019)).

(although somewhat inconsistently) used both standards on summary judgment to evaluate—after the defendant rebuts the presumption of discrimination—the trial-worthiness of the plaintiff's claim when indirect evidence is used to infer discrimination under the ICRA. *See Hedlund*, 930 N.W.2d, at 731 & n.12 (Appel, J., concurring in part and dissenting in part) (observing that the Iowa Supreme Court has historically "evaluated civil rights claims at the summary judgment stage under both the *McDonnell Douglas* [determining factor] and the a-motivating-factor standards" depending on "the framework advanced by the plaintiff"). *Compare McQuistion v. City of Clinton*, 872 N.W.2d 817, 828–29 (Iowa 2015) (applying the "determining factor" standard), *with Nelson v. James H. Knight DDS, P.C.*, 834 N.W.2d 64, 71 (Iowa 2013) (applying the "motivating factor" standard). *See generally Hawkins*, 929 N.W.2d at 271 ("The motivating-factor standard is a lower standard than the determining-factor standard.") (citing *DeBoom*, 772 N.W.2d at 13).

Although not explicitly stated, the Iowa Supreme Court's modified *McDonnell Douglas* test set forth in *Feeback*, which mandates use of the "motivating factor" standard at summary judgment, encompasses both so-called "single-motive" and so-called "mixed-motive" discrimination claims resting on indirect evidence. The Second Circuit Court of Appeals has helpfully illustrated the distinction between the two types of claims. The Second Circuit described a "single-motive" case:

> For example, a plaintiff says that he was fired because of his race, the employer responds that he fired the employee because he was regularly late for work, and the fact-finder determines whether the plaintiff has proved that the firing was motivated by race. In this example, both sides agree that there is only one motivation, and the issue is whether it was race or lateness. If the plaintiff proves that the adverse action was motivated by race, he has necessarily disproved that it was motivated by lateness. In other words, he has simultaneously proved discrimination and also proved that the proffered explanation was a pretext.

28

*Fields v. N.Y. State Off. of Mental Retardation & Dev. Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997). Cases in this category are sometimes called "pretext cases" because "the plaintiff usually challenges the defendant's proffered assertion of a permissible reason as a pretext for the impermissible reason of discrimination." *Id.* at 119. It is more appropriate to call these claims "single-motive" claims, however, as "the fact-finder must decide only the single issue of whether an impermissible reason motivated the adverse action." *Id.* at 119–20. Building off the previous illustration, the Second Circuit described a "mixed-motive" case:

> In the above example, the employer might have had in mind both race and lateness. Courts have said that the plaintiff had to prove that an impermissible reason, even though not the only reason for an adverse employment decision, was a "substantial" or "motivating" factor, or "made a difference" in the decision. But the illegitimate reason could be a substantial or a motivating factor, or could have made a difference, even though a legitimate reason was *also* part of the employer's motivation. If the plaintiff presented evidence to prove that the impermissible reason was at least in part a motivating factor for the adverse decision, the defendant had the option of attempting to prove, as an affirmative defense, that it would have taken the same action for the permissible reason alone. Or the defendant could decline this option and argue to the fact-finder that the plaintiff had failed to prove that the impermissible reason was even in part a motivating factor.

*Id.* at 120 (cleaned up); *see also Hedlund*, 930 N.W.2d at 727 (Appel, J., concurring in part and dissenting in part) (contending that "[f]rom the outset, *McDonnell Douglas* was flawed" because "[i]t presumed that there was only a single reason for the challenged decision" when "[i]n fact, that is rarely the case," and observing that "[t]he plaintiff might not prove that all the reasons advanced by the employer were pretextual, but illegal discrimination might have been a motivating factor in the adverse employment action").

In *Feeback*, the Iowa Supreme Court explained that after the defendant rebuts the presumption of discrimination raised by the prima facie case, "the burden shifts back to

the employee to demonstrate the employer's proffered reason is pretextual *or*, while true, was not the only reason for [their] termination *and* that [their protected trait] was another motivating factor." 988 N.W.2d at 348 (emphases added) (citing *Hawkins*, 929 N.W.2d at 272). In setting forth the "motivating factor" standard to be used at summary judgment, the court drew no distinction between single-motive and mixed-motive claims. Thus, the court's use of "or" in the above quotation should be read as disjunctive insofar as a plaintiff may freely choose whether or not to challenge the employer's proffered reasons as pretext. Conversely, "and" should be read as conjunctive with either option, respectively, insofar as the plaintiff—whether making a pretext challenge or not—*must* prove that discrimination was a motivating factor in the employment action. *See Newberry v. Burlington Basket Co.*, 622 F.3d 979, 982–83 (8th Cir. 2010) (analyzing Iowa law and determining that "motivating factor" jury instruction was proper in a single-motive case under the ICRA); *Hawkins*, 929 N.W.2d at 268–72 (reaffirming adoption of the *Price Waterhouse* "motivating factor" standard in mixed-motive cases under the ICRA). Thus, *Feeback*'s "modified" *McDonnell Douglas* test provides plaintiffs with what may be called a "pretext alternative" as well as a "mixed-motive alternative" to survive summary judgment. *See Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc.*, 285 F. Supp. 2d 1180, 1197–98 (N.D. Iowa 2003).

When a plaintiff proceeds under the "pretext alternative," the ultimate burden of persuasion requires the plaintiff to establish that the defendant's proffered reason was not only pretextual, *but also* the ultimate fact of the plaintiff's claim: that discrimination was a motivating factor in the challenged action. Evidence adduced to support the plaintiff's prima facie case *may* itself be sufficient to sustain such a finding. As the United States Supreme Court explained:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show

intentional discrimination.  Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and upon such rejection, no additional proof is *required*.

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (cleaned up) (emphases in original).  The fact-finder's rejection of the defendant's proffered reasons, however, does not itself *compel* judgment for the plaintiff.  *Id.*; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.").  On the other hand, when a plaintiff proceeds under the "mixed motive alternative," the plaintiff is *not required* to prove that the employer's proffered reason was pretextual.  Whether the plaintiff challenges the employer's reason as pretext to support the plaintiff's burden of persuasion is up to the plaintiff.  Indeed, the plaintiff "can invite the jury to ignore the defendant's proffered legitimate explanation and conclude that discrimination was a motivating factor, whether or not the employer's proffered explanation was also in the employer's mind." *Fields*, 115 F.3d at 121.

The Iowa Supreme Court employed certain language when it applied its new, modified *McDonnell Douglas* test in *Feeback* which, if stripped of context, might be read to suggest that to survive summary judgment the plaintiff's burden always requires a showing both that the protected trait was a motivating factor *and* that the proffered reason was pretextual .  *See Feeback*, 988 N.W.2d at 348 ("Under . . . the modified *McDonnell Douglas* test, to survive summary judgment, [the plaintiff] *had* to show [they] had admissible evidence to establish [the defendant's] proffered reason was a pretext for age discrimination and his age was a motivating factor for his termination.") (emphasis added).  Indeed, the court's opinion expressly stated that "[t]o survive summary judgment, [the plaintiff] '*must* show that [their] employer did not honestly believe the legitimate reason that it proffered in support of the adverse action.'" *Id.* at 349–50

(emphasis added) (quoting *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012)). Contextualizing this language is essential, however, for as will be seen, it applies only when the plaintiff elects to proceed under the "pretext alternative" so as to raise a genuine issue of material fact to survive summary judgment.

It is important to recognize that in *Feeback*, the plaintiff did indeed proceed under the "pretext alternative." To show genuine issues of material fact to survive summary judgment, the plaintiff in *Feeback* attempted to challenge the defendant's proffered reasons for its employment action as pretextual, and argued that a reasonable jury viewing the evidence could find the defendant's reasons were in fact a pretext. *See* 988 N.W.2d at 349–52. It is implicit in such an argument that if the jury could find the fact of pretext, then the jury could also find for the plaintiff on the ultimate fact: that the plaintiff's protected characteristic was a motivating factor in the defendant's action (and indeed the jury could potentially make such a finding based only on the evidence adduced to support the plaintiff's prima facie case). *See Hicks*, 509 U.S. at 511. Thus, the *Feeback* court's language which "required" a showing of pretext is limited to the context: plaintiff's attempt to argue for pretext as one way to survive summary judgment (*i.e.*, the "pretext alternative"). A complete picture comes into view upon recognizing that the *Feeback* plaintiff *also* attempted to proceed, separately, under the "mixed motive alternative."

The *Feeback* plaintiff also argued that regardless of the defendant's proffered reasons for termination, the defendant's protected trait (age) was a motivating factor in the defendant's decision to fire him because the defendant had previously fired, demoted, or forced out nine other employees who were over the age of fifty-five (*i.e.,* the "mixed-motive alternative"). *See* 988 N.W.2d at 351–52. In evaluating plaintiff's argument under the "mixed motive alternative," the *Feeback* court's inquiry did not concern whether there was a genuine issue of material fact on pretext. *Compare id.* at 352 (finding the plaintiff "failed to raise a jury question on age discrimination."), *with id.* at 351

32

(finding the plaintiff failed to show "there was a fact question on pretext; that is, whether he was terminated for his age, not for insubordination"), *and id.* at 350 (finding the plaintiff's mistake theory failed to "raise[ ] a jury question on whether insubordination was a pretext for age discrimination"). Ultimately, the *Feeback* court concluded that the plaintiff did not raise a genuine issue of material fact—neither as to the "pretext alternative" nor the "mixed-motive alternative"—which, if established, would have precluded summary judgment as to the ultimate issue of whether the plaintiff's protected trait was a motivating factor in the defendant's employment decision. *Id.* at 349–52. Thus, the court held that summary judgment for the defendant was appropriate. *Id.* at 352.

In sum, it suffices simply to reiterate that, under the Iowa Supreme Court's modified *McDonnell Douglas* summary judgment test for claims relying on indirect evidence to infer discrimination under the ICRA, if and when the presumption of discrimination drops from the case upon the defendant's articulation of some legitimate, nondiscriminatory reason for its action, the court's analysis "focuses on whether there is a genuine issue of material fact that the plaintiff's [protected characteristic] was a motivating factor in the adverse employment action," *Hedlund*, 930 N.W.2d at 735 (Appel, J., concurring in part and dissenting in part), and the plaintiff may attempt to make this showing via either the "pretext alternative" or the "mixed motive alternative."[9]

---

[9] The foregoing understanding of how to apply the Iowa Supreme Court's new, modified *McDonnell Douglas* test is congruent with how the Fifth Circuit Court of Appeals applies its own so-called "modified *McDonnell Douglas* approach" to implement the "motivating factor" standard to claims under Title VII of the federal Civil Rights Act, and which the *Feeback* opinion appears to have rearticulated almost verbatim in the context of claims under the ICRA. *Compare Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312–13 (5th Cir. 2004), *with Feeback*, 988 N.W.2d at 347–48.

## V. ANALYSIS

Defendant contends there is no genuine issue of material fact in view of the record presented and that defendant is entitled to judgment as a matter of law as to each of plaintiff's four claims. Specifically, as to Count I, defendant argues that plaintiff does not meet the definition of "disability" under the ICRA nor can plaintiff prove to a reasonable jury, even if plaintiff qualifies as disabled, that plaintiff's disability was a motivating factor in defendant's decision to suspend and eventually fire plaintiff. (Doc. 27, at 8–12). As to Count II, defendant argues that the evidence about the conduct of defendant's employees does not meet the standard for hostile work environment under the ICRA, nor can plaintiff demonstrate that the alleged harassment was based on plaintiff's disability. (*Id.*, at 13–15). As to Count III, defendant argues that plaintiff cannot prove to a reasonable jury that he engaged in a protected activity under the ICRA— namely, reporting unlawful discrimination or harassment—nor can plaintiff prove a causal connection between any alleged protected activity and defendant's decision to suspend and eventually terminate plaintiff. (*Id.*, at 15–16). As to Count IV, defendant argues that plaintiff cannot prove to a reasonable jury that his workplace safety complaints shared a causal connection with defendant's decision to suspend and eventually terminate plaintiff. (*Id.*, at 16–18).

In response, plaintiff argues for the existence of several genuine issues of material fact precluding defendant from obtaining summary judgment. Specifically, plaintiff argues that genuine issues of fact exist as to whether plaintiff was disabled, was regarded as disabled, or had a record of disability. (Doc. 29-1, at 13–14). Plaintiff also argues that genuine issues of fact exist as to whether plaintiff was retaliatorily terminated in violation of the public policy encouraging employees to make internal complaints related to safety issues. (*Id.*, at 8–9). Further, plaintiff argues that "[a] reasonable jury could find that [d]efendant's purported reason for terminating [p]laintiff was pretextual and the

34

statements obtained from other employees were either requested in response to [p]laintiff's complaints of discrimination/harassment and/or safety issues, or for the purpose of creating a legitimate reason for his termination." (*Id.*, at 10–13).

The Court will take up the parties' arguments in turn.

### A.      Count I: Disability Discrimination in Violation of ICRA

To prevail on a disability discrimination claim under the ICRA, "[the plaintiff] must initially prove a prima facie case by showing: (1) he has a disability, (2) he is qualified to perform the essential functions of the job, and (3) the circumstances of his termination raise an inference of illegal discrimination." *Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 22 (Iowa 2021) (quoting *Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 (Iowa 2014)).

Iowa law defines "disability" as "the physical or mental condition of a person which constitutes a substantial disability." Iowa Code § 216.2(5) (2023). The Iowa Supreme Court has construed this statutory language to cover "any person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment." *Goodpaster*, 849 N.W.2d at 6 (quoting IOWA ADMIN. CODE r. 161-8.26(1)). Mental impairments covered under the ICRA include "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." *Id.* at 7 (quoting Iowa Admin. Code r. 161-8.26(2)). "The term 'major life activities' means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* (quoting Iowa Admin. Code r. 161-8.26(3)); *see also id.* at 13 n.4 ("[T]he ability to work is something of a disability discrimination catchall, and impairments that substantially limit a person's ability to work usually substantially limit one or more other major life activities.") (internal quotation marks omitted).

35

"Whether a person has a disability is determined on a case-by-case basis." *Vincent v. Four M Paper Corp.*, 589 N.W.2d 55, 60 (Iowa 1999) (citing *Bearshield v. John Morrell & Co.*, 570 N.W.2d 915, 918 (Iowa 1997)). The Iowa Supreme Court has "required the proffered disability to be 'generally debilitating' and to 'affect [the employee] regardless of the job [they] might hold.'" *Goodpaster*, 849 N.W.2d at 13 n.4 (first alteration in original) (quoting *Henkel Corp. v. Iowa Civ. Rts. Comm'n*, 471 N.W.2d 806, 810 (Iowa 1991)). "An impairment that interferes with an individual's ability to do a particular job but does not significantly decrease that individual's ability to obtain satisfactory employment otherwise is not substantially limiting within [the ICRA]." *Id.* (quoting *Probasco v. Iowa Civ. Rts. Comm'n*, 420 N.W.2d 432, 436 (Iowa 1998)). Yet, the Iowa Supreme Court has rejected the notion "that one must be almost unemployable because of one's impairment to be considered disabled." *Henkel Corp.*, 471 N.W.2d at 810.

Here, although the evidence is sparse, the Court finds that for purposes of summary judgment, plaintiff has shown enough to raise genuine issues of material fact as to whether he suffered from any of several possible mental or psychological disorders during the time he worked for defendant—namely, adjustment disorder, Unspecified Mood Disorder, or PTSD, notwithstanding whether he had been explicitly diagnosed at that time—and that these conditions substantially limited his ability to learn or work, regardless of the job he might hold. *Cf. Goodpaster*, 849 N.W.2d at 9–10 (noting, in the context of determining whether purported conditions constitute a disability, that the ICRA declares that it "shall be construed broadly to effectuate its purposes," and rejecting the guidance of federal cases narrowly interpreting the Americans with Disabilities Act) (quoting Iowa Code § 216.18(1)).

Plaintiff has shown enough to raise a genuine issue of material fact as to whether he has an ongoing physical or mental impairment. Plaintiff testified that he was told by

a therapist in 1987 or 1988 that he had adjustment disorder, which involves "having a hard time adjusting to new situations," and that he has sought out various mental health treatments throughout his life. He also identified himself as "hav[ing] a disability, or hav[ing] a history/record of having a disability" when he applied to defendant. Plaintiff further testified that his current diagnoses of Unspecified Mood Disorder and PTSD accurately reflect additional conditions he experienced during his time working for defendant, even though these went undiagnosed at that time because "health professionals missed their opportunity to diagnose [him] correctly" until recently. Crediting plaintiff's testimony in the light most favorable to the non-moving party and taking all these facts together, a reasonable jury might find that plaintiff suffered from an "actual" mental or psychological disorder during his time employed with defendant. *See id.* at 7.

Furthermore, plaintiff has shown enough to raise a genuine issue of material fact as to whether his mental or physical disorder substantially limited one or more major life activities. There is evidence in the record from which the jury might infer that plaintiff's mental condition(s) substantially interfered with his ability to learn or work. Plaintiff's employment history reflects a great deal of instability, including anecdotes where plaintiff often found himself in conditions of enmity with others, such as at Hy-Vee, at Birch Cabinets, and at defendant. (*See* Doc. 27-2, at 7–10). This turbulent history would appear to be in accord with plaintiff's various purported mental disorders, to which his regular struggles to advance and succeed in employment may indeed be attributable. Thus, upon granting all reasonable inferences in plaintiff's favor, the Court determines that a reasonable jury could find the facts necessary to bring plaintiff within the expanse of the ICRA's definition of "disability."

Yet, even if plaintiff meets the definition of disabled under the ICRA, and taking for granted that plaintiff was qualified to perform the essential functions of the job (as the parties do not dispute this element), plaintiff ultimately fails to meet the third element

of the prima facie case: that the circumstances of his termination raise an inference of illegal discrimination. *Rumsey*, 962 N.W.2d at 22.

When articulating the elements of the prima facie case for discrimination under the ICRA in *Feeback*, the Iowa Supreme Court approvingly cited *Beasley v. Warren Unilube, Inc.*, a case in which the Court of Appeals for Eighth Circuit stated that "there are multiple ways 'a plaintiff can establish an inference of discrimination'" to satisfy this prima facie element. 933 F.3d 932, 937 (8th Cir. 2019) (quoting *Grant v. City of Blytheville*, 841 F.3d 767, 774 (8th Cir. 2016); *see Feeback*, 988 N.W.2d at 347. Probing further for specific guidance from the *Feeback* court's citation to the Eighth Circuit in *Beasley*, a case which in turn quoted *Grant*, reveals that the "variety of ways" a plaintiff can establish an inference of discrimination at the prima facie stage includes doing so "by showing more-favorable treatment of similarly-situated employees who are not in the protected class, by showing biased comments by a decisionmaker, or by showing pretext with evidence that an employer failed to follow its own policies or shifted its explanation of the employment decision." 841 F.3d at 774 (cleaned up); *see also Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014) (noting that "pretext can also satisfy the inference-of-discrimination element of the prima facie case" in addition to being used to disprove an employer's proffered reason for an employment decision (citing *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010)).

Here, plaintiff fails to point to any evidence that would raise an inference of discrimination sufficient to make out a prima facie case. Plaintiff has not identified a similarly-situated employee who is not disabled and whom defendant treated differently. Plaintiff also has not produced evidence of biased comments by a decisionmaker. In this vein, plaintiff has not even identified the "decisionmaker" at defendant who chose to suspend and terminate him. Plaintiff emphasizes the disagreements he had with his direct supervisor, Ahren, who told plaintiff he was "not going to change the world for

[plaintiff]" in response to plaintiff's requests to have wiring harnesses labeled; yet, even if Ahren *were* a decisionmaker in plaintiff's termination (which plaintiff has not shown), plaintiff himself expressly stipulated to the fact that he simply "has no knowledge or facts that Ahern discriminated against him due to a disability." (Docs. 27-1, at 19–20; 29-2, at 12).

Plaintiff also fails to show pretext sufficient to make out a prima facie case. Plaintiff insists that he was terminated in *retaliation* for reporting conduct which was, in his view, "harassment and discrimination" and that defendant's proffered reasons for terminating him—*i.e.*, his aggressive and intimidating behavior and multiple coworker reports expressing concerns about him—are a pretext to cover up this retaliation. Taking this line of argument further, plaintiff contends that this "pretext" justifies surviving summary judgment on his disability discrimination claim. This argument fails on its premise, *i.e.*, that evidence of retaliation is necessarily evidence of discrimination. To be clear, to make out a prima facie case for discrimination, plaintiff must point to some evidence that raises an inference of discrimination and which is ultimately used to prove that defendant's disability was a "motivating factor" in its decision to terminate him. This showing is distinct from the separate claim of retaliation, which asks whether defendant decided to terminate plaintiff in response to engaging in a protected activity such as reporting discrimination. The distinction is that a discrimination claim is rooted in an employment decision connected to a plaintiff's disability alone, while a retaliation claim is rooted in an employment decision connected to a plaintiff's "protected activity," the definition of which constitutes a separate legal inquiry which may (although does not necessarily) involve the plaintiff's underlying disability. *See infra* § V(C). Here, plaintiff's argument accusing defendant of disability discrimination is rooted in his *action*—reporting conduct which he viewed to be "harassment and discrimination"—not in his *status* as disabled.

39

Simply put, on his discrimination claim, plaintiff fails to raise any argument that the evidence reflects the existence of a causal relationship between plaintiff's disabled status and defendant's decision to terminate him such that plaintiff's purported disability could be said to be a "motivating factor" in defendant's employment decision. *See Hart v. Deere & Co.*, No. C22-2024-LTS, 2023 WL 6628607, at \*8 (N.D. Iowa Oct. 11, 2023) ("[Plaintiff's] argument does not suggest that he was treated differently based on his [protected characteristic], but that he was retaliated against for filing a complaint. The temporal proximity [between plaintiff's complaint and the adverse action] does not create an inference of discrimination for purposes of [plaintiff's] disparate treatment claim.").

In sum, because plaintiff has failed to point to evidence in the record that shows the circumstances of his termination raise an inference of illegal discrimination, he therefore fails to make out a prima facie case for discrimination under the ICRA. Thus, the Court **grants** defendant's motion for summary judgment as to Count I of plaintiff's complaint.

### B.    Count II: Harassment in Violation of ICRA

In Count II of plaintiff's complaint, he describes his claim as "harassment" under the ICRA. (*See* Doc. 3, at 3–4). Iowa courts would characterize plaintiff's cause of action, however, as a "hostile work environment claim" under section 216.6(1)(a) of the Iowa Code. *See, e.g.*, *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 571 (Iowa 2017); *Simon Seeding & Sod, Inc. v. Dubuque Hum. Rts. Comm'n*, 895 N.W.2d 446, 468–69 (Iowa 2017). Thus, the Court will refer to plaintiff's claim in Count II as his hostile work environment claim.

To prevail on a hostile work environment claim under the ICRA, the plaintiff must show: "(1) he or she belongs to a protected group; (2) he or she was subjected to unwelcome harassment; (3); the harassment was based on a protected characteristic; and

40

(4) the harassment affected a term, condition, or privilege of employment." *Haskenhoff*, 897 N.W.2d at 571 (quoting *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 746 (Iowa 2006)). In addition to these elements, when a nonsupervisory employee perpetrates the harassment, "the plaintiff must show the employer 'knew or should have known of the harassment and failed to take proper remedial action.'" *Farmland Foods*, 672 N.W.2d at 744 (quoting *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 631 (8th Cir. 2000)).

Regarding the fourth element, "[h]arassment affects a term, condition, or privilege of employment when the workplace is permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (cleaned up). To prove this element, the plaintiff must show both that "he or she 'subjectively perceived the conduct as abusive' and that 'a reasonable person would also find the conduct to be abusive or hostile.'" *Simon Seeding*, 895 N.W.2d at 469 (quoting *Farmland Foods, Inc. v. Dubuque Hum. Rts. Comm'n*, 672 N.W.2d 733, 744 (Iowa 2003)). To objectively determine whether a reasonable person would find the alleged conduct to be "abusive or hostile," Iowa courts consider all of the circumstances, including the following four factors: "(1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct was physically threatening or humiliating or whether it was merely offensive, and (4) whether the conduct unreasonably interfered with the employee's job performance." *Farmland Foods*, 672 N.W.2d at 744 at 744–45 (citing *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 23 (1993)). The Iowa Supreme Court has clarified that "hostile-work-environment claims by their nature involve ongoing and repeated conduct, not isolated events." *Id.* at 745 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)).

Iowa courts, when evaluating hostile work environment claims, have explained that "[t]o succeed . . ., the employee must meet a high standard" and that "[t]o support

a claim, the conduct must be extreme and not merely rude or unpleasant." *Munoz v. Adventure Lands of Am., Inc.*, No. 19-2097, 2021 WL 377441, at *3 (Iowa Ct. App. Feb. 3, 2021) (citations omitted). The Iowa Court of Appeals in *Munoz* cited the following cases to exemplify the high standard plaintiff's must meet: *Ryan v. Cap. Contractors, Inc.*, 679 F.3d 772, 775–79 (8th Cir. 2012) (finding as a matter of law that plaintiff, who was "moderately mentally retarded" and spoke with a stutter, failed to demonstrate the elements required to establish a hostile work environment claim despite the fact that plaintiff's coworkers often called him "fucking dummy," "fucking retard," "stupid," "idiot," and "numb nuts," and asked him if he was dropped on his head when he was young); *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721–23 (8th Cir. 2003) (upholding summary judgment in favor of defendant despite the fact that an epileptic plaintiff's coworkers routinely referred to him as "platehead" or otherwise suggested he was stupid for a period of about two years, and that one coworker said he "pissed in his pants when the microwave was on"). The *Munoz* court also cited the following cases to exemplify how "a short period of time is a factor in determining whether a hostile-work-environment claim is viable": *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987) (finding no hostile work environment when the alleged incidents were limited in number and occurred over a short time frame); *Benette v. Cinemark U.S.A., Inc.*, 295 F. Supp. 2d 243, 251 (W.D.N.Y. 2003) (noting that conduct spanning three months was insufficient in in duration and severity, despite there being no threshold time requirement that a plaintiff must surpass); *Malesevic v. Tecom Fleet Servs., Inc.*, 72 F. Supp. 2d 932, 939 n.1 (N.D. Ind. 1998) (noting that the short period in which the alleged comments transpired negated any suggestion that the harassment was extensive enough to amount to a hostile work environment.).

Plaintiff's brief in support of his resistance to defendant's motion for summary judgment does not acknowledge his hostile work environment claim, and thus plaintiff's

brief fails to raise an argument as to why summary judgment should not be granted to defendant on this claim. (*See* Doc. 29-1). At oral argument, plaintiff conceded the relative weakness of this claim. In support of summary judgment, defendant argues that plaintiff cannot demonstrate that the alleged harassment was based on his disability and that the evidence about the conduct of defendant's employees does not meet the standard for hostile work environment under the ICRA. (Doc. 27, at 13–15). The Court agrees with defendant on both bases.

Although hostile work environment claims present "mixed questions of law and fact that are especially well-suited for jury determination," *see Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (cleaned up), after reviewing the record in the light most favorable to plaintiff and granting all reasonable inferences in his favor, the Court finds that a reasonable jury simply could not find that the purported harassment in this case (A) was based on plaintiff's disability, nor (B) consisted of conduct so severe or pervasive as to constitute a hostile work environment. *See Haskenhoff*, 897 N.W.2d at 571. Plaintiff testified that he believes he was harassed by Vick with Vick's condescendingly spoken comment, "get your head out of your ass," and because Vick was "hypocritical" and "a control freak" as a trainer. The only other individual whom plaintiff alleges to have harassed him is Ahern, who once yelled at him, "We're not going to change the world for you." Plaintiff also testified that he did not like working with Ahern because plaintiff found Ahern "unrelatable," and plaintiff's "intuition" told him that Ahern did not like him. Accepting all these things as true, plaintiff fails to draw any concrete connection between Vick and Ahern's conduct and his mental impairments so as to say the conduct was "based on" his disability, nor can the Court discern any connection, even when granting plaintiff the benefit of all reasonable inferences. Further, even though plaintiff subjectively felt harassed by these infrequent and isolated unpleasantries and personality conflicts, the Court holds as a matter of law that this

conduct is neither sufficiently severe nor pervasive such that "a reasonable person would also find the conduct to be abusive or hostile." *Simon Seeding*, 895 N.W.2d at 469.

Thus, the Court **grants** defendant's motion for summary judgment as to Count II of plaintiff's complaint.

### C.    *Count III: Retaliation in Violation of ICRA*

Chapter 216 of the Iowa Code provides, in pertinent part:

It shall be an unfair or discriminatory practice for:
2. Any person to discriminate or retaliate against another person in any of the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under this chapter[.]

Iowa Code § 216.11.  "A prima facie case of retaliation under the ICRA requires the plaintiff to establish (1) he engaged in statutorily protected activity, (2) he was subjected to an adverse employment action, and (3) a causal connection between his participation in the protected activity and the adverse employment action."[10] *Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 28 (Iowa 2021) (citing *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 750 (Iowa 2006)).

To have "engaged in a protected activity," the plaintiff must show his conduct was sufficiently related to a protected characteristic—for example, a disability—so that the

---

[10] As for the proper standard for assessing the third element's causal connection, in *Hawkins v. Grinnell Regional Medical Center*, the Iowa Supreme Court adopted the *Price Waterhouse* "motivating factor" causation test when instructing the jury on ICRA retaliation claims.  292 N.W.2d 261, 272 (Iowa 2019).  Although not yet made explicit, there is no reason to believe the Iowa Supreme Court would not sanction use of the "motivating factor" standard to evaluate ICRA retaliation claims at the summary judgment stage—just as they did with ICRA discrimination claims in *Feeback*—in keeping with the prevailing spirit of bringing the law at the summary judgment stage into alignment with the same standards used at trial for claims under the ICRA.  *Cf. Rumsey* (reaffirming the "motivating factor" causation standard for retaliation claims under the ICRA in the context of reviewing a jury verdict); *Feeback*, 988 N.W.2d at 347 (adopting the "motivating factor" causation standard for discrimination claims under the ICRA when reviewing summary judgment to bring the summary judgment test into alignment with the standards used at trial).

44

conduct could be considered "lawfully oppos[ing] any practice forbidden" under chapter 216 of the Iowa Code.[11] Iowa Code § 216.11(2); *Rumsey*, 962 N.W.2d at 28–29. "This requirement keeps a retaliation claim within the confines of the [ICRA], which prohibits retaliation only with respect to 'any of the rights protected against discrimination by this chapter.'" *Rumsey*, 962 N.W.2d at 28 (quoting Iowa Code § 216.11(2)). In *Rumsey*, the Iowa Supreme Court assumed without deciding that requesting an accommodation for a disability could potentially constitute a "protected activity" under the ICRA. *Id.* Yet, to be "sufficiently related to a claimed disability" so as to be "protected activity," the *Rumsey* court observed that the requested accommodation would need to be a reasonable one "that would allow [the employee] to perform the essential functions of the job" and which demonstrates "a good faith belief that the requested accommodation was 'appropriate' within the context of the [statute]." *Id.* (citing *Heisler v. Metro. Council*, 339 F.3d 622, 632 (8th Cir. 2003)). The court explained that "[a] request for an accommodation that clearly would not enable the employee to perform the essential functions of his job would not be reasonable, and therefore not appropriate, so there would [be] no basis for finding that the employee was engaged in protected activity." *Id.* (citing *Monroe v. Fla. Dep't Corr.*, 793 F. App'x 924, 928 (11th Cir. 2019) (per curiam); *Williams v. Eastside Lumberyard & Supply Co.*, 190 F. Supp. 2d 1104, 1122 n.15 (S.D. Ill. 2001)).[12]

---

[11] The language of Iowa Code section 216.11(2) also permits "protected activity" to include conduct that could be considered "obey[ing] the provisions of [the ICRA], or [filing] a complaint, testif[ying], or assist[ing] in any proceeding under the ICRA," so long as that conduct is sufficiently related to a protected characteristic such that to retaliate against it would implicate "any of the rights protected against discrimination by [the ICRA]." *See* Iowa Code § 216.11(2).

[12] The plaintiff in *Rumsey* requested two separate accommodations: the first asked his employer to allow him to perform work sitting down due to an injury he sustained (which constituted a disability), and the second asked his employer to provide a sign language interpreter for a meeting because he was hearing impaired (also constituting a disability). 926 N.W.2d at 16–20. The first accommodation would have required Rumsey's employer to create a new position. The

Defendant argues that plaintiff cannot prove to a reasonable jury that he engaged in a protected activity under the ICRA—namely, reporting unlawful discrimination or harassment—nor can plaintiff prove a causal connection between any alleged protected activity and defendant's decision to suspend and eventually terminate plaintiff. (Doc. 27, at 15–16). In resistance to summary judgment, plaintiff argues that "the timing of [plaintiff's] complaint of discrimination and harassment on October 6, 2021, and his suspension the very next day is extremely suspicious." (Doc. 29-1, at 12). Because of the temporal connection between plaintiff's Compliance Hotline calls and his suspension and eventual termination, plaintiff contends that "[a] reasonable jury could find that Defendant's purported reason for terminating Plaintiff was pretextual and the statements obtained from other employees were either requested in response to Plaintiff's complaints of discrimination/harassment . . ., or for the purpose of creating a legitimate reason for his termination." (Doc 29-1, at 12–13).

To avail himself of the ICRA's protection against retaliation, plaintiff must show that the conduct which invited the retaliatory action was a "protected activity." Plaintiff argues that defendant retaliated against him for placing complaints through defendant's Compliance Hotline to report "discrimination" and "harassment." In effect, plaintiff is arguing that he should receive the protection against retaliation provided by Iowa Code section 216.11(2) because he suffered an adverse employment action for "lawfully

---

Iowa Supreme Court observed that "our caselaw makes clear than an accommodation is not reasonable if it requires the employer to create a new position." 926 N.W.2d at 29 (citing *Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 521 (Iowa 2003); *Schlitzer v. Univ. of Iowa Hosps. & Clinics*, 641 N.W.2d 525, 530 (Iowa 2002)). "Therefore," the court explained, "Rumsey cannot be said to have been engaging in the protected activity of opposing disability discrimination under the ICRA when he requested a sit-down restriction because that was clearly not a reasonable accommodation that would have enabled him to perform the essential functions of an available job." *Id.* Thus, "Rumsey failed to establish he was engaged in statutorily protected activity under the ICRA," *i.e.*, the first element of his claim for retaliation for requesting a sit-down accommodation. *Id.*

oppos[ing] any practice forbidden" under the ICRA. The practices plaintiff claims to have been opposing with his Hotline calls were the "discrimination" and "harassment" which he took himself to have suffered. The ICRA indeed forbids the practices of discrimination and harassment; yet, as explained above, the Court has already determined that as a matter of law, plaintiff experienced neither the kind of discrimination nor the kind of harassment that the ICRA contemplates and forbids. Because the practices plaintiff claims to have been opposing fell outside the scope of conduct forbidden by the ICRA, he cannot be said to have been "lawfully opposing any practice forbidden" by the ICRA. In other words, plaintiff was not opposing *legally actionable* discrimination or harassment when he made his Hotline calls, and his retaliation claim is therefore not "within the confines" of the ICRA. Thus, summary judgment in favor of defendant is appropriate on plaintiff's retaliation claim concerning the conduct relating to plaintiff's Hotline calls.

Additionally, although plaintiff does not explicitly raise the argument in his briefing, the Court will briefly consider whether defendant retaliated against plaintiff for requesting accommodations for his purported disability, seeing as plaintiff's experience at defendant apparently involved a good deal of trouble over his requests to have certain wiring harnesses labeled, and plaintiff insists that these requests were, in his eyes, requests for an accommodation for his disability.

The initial question is whether plaintiff's requests to have wiring harnesses labeled to accommodate his purported disability could constitute "protected activity." To constitute a "protected activity," plaintiff is required to show that his requests were reasonable ones "that would allow [him] to perform the essential functions of the job" and which demonstrate "a good faith belief that the requested accommodation was appropriate" within the context of the ICRA. *Rumsey*, 962 N.W.2d at 28–29 (internal quotation marks omitted). In *Rumsey*, the Iowa Supreme Court provided several

examples of requests for accommodations that the court considered to be, at the least, "not per se unreasonable." 962 N.W.2d at 31. The *Rumsey* court explained that "requesting a sign language interpreter for a meeting with [Human Resources] could be considered protected activity" for purposes of a retaliation claim. *Id.* "Providing a sign language interpreter for an important meeting," the court explained, "is akin to providing a ramp into the building for a wheelchair-bound employee." *Id.* To support the notion that requests for these specific accommodations are "reasonable" so as to constitute "protected activity," the *Rumsey* court cited Iowa Administrative Code rule 161-8.27(6)(a), which provides examples of "reasonable accommodations" to be made by employers for handicapped employees, including "[m]aking facilities used by employees readily accessible to and usable by handicapped persons" and providing "readers or interpreters." *Id.* (quoting Iowa Admin. Code r. § 161-8.27(6)(a); *see also* 42 U.S.C. § 12111(9).

In view of the examples in *Rumsey*, the Court assumes without deciding that plaintiff's requests to have wiring harnesses labeled at his jobsite could potentially be "reasonable" and constitute a "protected activity" such that to retaliate against the requests with an adverse employment action would amount to disability discrimination in violation of Iowa Code section 216.11(2).[13] Plaintiff testified that having labels on the machinery would "enable [him] to do [his] job correctly." Much like how a sign language interpreter may enable a hearing-impaired individual's understanding so as to "perform the essential functions of the job," it seems as though the labeling of certain things on

---

[13] Embedded within this assumption is (A) the inference that plaintiff requested these accommodations as a result of his purported mental impairments and (B) the assumption of a finding by a jury that those mental impairments in fact constituted a "disability" within the meaning of the ICRA. For purposes of ruling on a motion for summary judgment, it is appropriate for the Court to make these assumptions by viewing the evidence in the light most favorable to the non-moving party.

plaintiff's jobsite may have assisted plaintiff, whom the Court assumes here to be learning-impaired, to understand and perform the essential functions of his job. Plaintiff's testimony also reflects that he had a good faith belief that that his requests to label the harnesses were appropriate. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003) ("The requirement of a good faith request for an accommodation means that the protection from retaliation afforded under the ADA does not extend to an employee whose request is motivated by something other than a good faith belief that he/she needs an accommodation."); *see also Heisler*, 339 F.3d at 632 (citing *Shellenberger*, 318 F.3d at 191). Thus, like in *Rumsey*, the Court will assume that plaintiff's accommodation requests constituted a "protected activity" as reasonable requests for accommodation. *Rumsey*, 962 N.W.2d at 28–31.

Yet, even if plaintiff's requests to have wiring harnesses labeled constituted a "protected activity" as reasonable requests for accommodation, plaintiff still must prove a causal connection between his requests and his suspension or termination such that his requests were a "motivating factor" in defendant's decision.[14] On this issue, no reasonable jury could conclude a causal connection exists. "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue" on the causal connection element of a prima facie case of retaliation under the ICRA. *Rumsey*, 962 N.W.2d at 32 (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 2015)); *see also Boyle*, 710 N.W.2d at 750 (reversing the district court's refusal to rule on a retaliatory discharge claim after stating, "While mere coincidence of timing does not conclusively establish [the causal connection] element, the timing of the action, *combined with all other*

---

[14] The Court assumes that the proper standard for evaluating the causal connection between the protected activity and the adverse employment action on a retaliation claim at the summary judgment stage is the "motivating factor" causation standard. *See supra* n. 10; *Rumsey*, 962 N.W.2d at 31–32.

*circumstances* present in this case, entitles [plaintiff] to a ruling on her retaliatory discharge claim" (emphasis added)). Plaintiff testified that Ahern yelled at him, "We're not going to change the world for you," in response to plaintiff's requests to have wiring harnesses labeled. Assuming this fact to be true, however, even when coupled with a close temporal proximity to plaintiff's suspension and termination, the Court finds that a reasonable jury could not conclude from these circumstances that plaintiff's requests were a "motivating factor" in defendant's decision to terminate him.

In sum, whether the purported "protected activity" involves plaintiff's Hotline calls or his requests to have wiring harnesses labeled, plaintiff ultimately fails to raise genuine issues of material fact such that he could meet the elements of a prima facie retaliation claim under the ICRA. Thus, the Court **grants** defendant's motion for summary judgment as to Count III of plaintiff's complaint.

### D. Count IV: Retaliation in Violation of Public Policy

Under Iowa law, "wrongful termination"[15] is an exception to the general rule that employment is at-will. *See Jones v. Univ. of Iowa*, 836 N.W.2d 127, 144 (Iowa 2013) (citing *Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 109 (Iowa 2011)). "The narrow public-policy exception to the at-will employment doctrine 'limits an employer's discretion to discharge an at-will employee when the discharge would undermine a clearly defined and well-recognized public policy of the state.'" *Id.* (quoting *Berry*, 803 N.W.2d at 109). The seminal case recognizing such a tort under Iowa law held "that discharging an employee merely for pursuing the statutory right to compensation for work-related

---

[15] Courts refer to claims like plaintiff's claim in Count IV of his complaint under various names. *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 898 (Iowa 2015) ("wrongful discharge"); *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 561 (Iowa 1988) ("retaliatory discharge"); *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 314 (Iowa 2013) (Mansfield, J., concurring in part and dissenting in part) ("wrongful termination"). For consistency, the Court will refer to plaintiff's claim as one for "wrongful termination."

injuries offends against a clearly articulated public policy of this state." *Springer v. Weeks & Leo Co., Inc.*, 429 N.W.2d 558, 559 (Iowa 1988). Although the *Springer* court did not describe the claim as "retaliation" for filing a workers compensation claim, that was the gist of the claim, and the court subsequently identified the claim as one of "retaliation." *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 300 (Iowa 2013) ("We have consistently held that an employee cannot be discharged in retaliation for enforcing a statutory right. The first case to do so was *Springer*, 429 N.W.2d 558.").

In *Grim v. Centrum Valley Farms L.L.P.*, 2016 WL 1090575, at *4–5 (N.D. Iowa March 18, 2016), this Court analyzed the elements of a claim of wrongful termination under Iowa law, as modified and clarified by the Iowa Supreme Court in *Rivera v. Woodward Resource Center*, 865 N.W.2d 887 (Iowa 2015). This Court set forth the elements of the claim as follows:

> (1) the existence of a clearly defined and well-recognized public policy that protects the employee's activity; (2) this public policy would be undermined by the employee's discharge from employment; (3) the employee engaged in the protected activity; and (4) the employee's protected activity was the determining factor for the employer's discharge of the employee.

*Grim*, 2016 WL 1090575, at *5 (citing *Rivera*, 865 N.W.2d at 894–98; *Jones*, 836 N.W.2d at 144). Here, the parties' arguments hinge on the final element: causation. Because the Court finds that plaintiff ultimately cannot establish the requisite causation element, the Court need not resolve whether plaintiff can prove the first three elements and proceeds as though he can.[16]

_____

[16] In *Brown v. Farmland Foods, Inc.*, 178 F. Supp. 2d 961 (N.D. Iowa 2001), this Court predicted that the Iowa Supreme Court would apply the burden-shifting framework set forth in *McDonnell Douglass Corp. v. Green*, 411 U.S. 792, 802–04 (1973), to common law wrongful termination claims at the summary judgment stage. 178 F. Supp.2d at 979–80. In *Manahl v. State*, the Iowa Court of Appeals noted that in the years following *Brown*, the Iowa Supreme Court "has not confirmed that Iowa applies the *McDonnell Douglas* analysis to summary-

Under the final element, the "determining factor" causation standard in a wrongful termination case is high. *See Horn v. Airway Services, Inc.*, No. 18-CV-3053 CJW-MAR, 2020 WL 420834, at *8 (N.D. Iowa Jan. 27, 2020) (citing *Rivera*, 865 N.W.2d at 894); *see also Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 301–303 (Iowa 1998) (collecting cases). "[A] determining factor is one that tips the balance in an employment decision" decisively in favor of termination, even if it is not "the main reason for the decision." *Rivera*, 865 N.W.2d at 898 (citing *Teachout*, 584 N.W.2d at 302, and then quoting *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 686 (Iowa 1990)). Put another way, an employer's reason for firing an employee is the "determinative factor" if it is the "final straw," the one that pushes the employer over the edge to decide to fire the employee. *Id.* (citing *Davis v. Horton*, 661 N.W.2d 533, 535 (Iowa 2003)). A plaintiff in a wrongful termination action need not prove that the employer had no legitimate business justification for the termination. *Id.* An employer's legitimate business justifications for its actions, however, are relevant because "an employer will prevail if it convinces the fact finder that the legitimate business reasons supporting the action were so strong as to defeat the conclusion that the protected conduct was the determining factor in the adverse employment decision." *Id.* at 899 (citing *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 200–01, 203 (Iowa 1997)).

---

judgment motions in wrongful-discharge tort claims." No. 16-2154, 2017 WL 4317318, at *7 (Iowa Ct. App. Sept. 27, 2017). In *Horn v. Airway Services, Inc.*, No. 18-CV-3053 CJW-MAR, 2020 WL 420834 (N.D. Iowa Jan. 27, 2020), this Court acknowledged *Manhal*'s disagreement with *Brown*, but opted to continue to apply the *McDonnell Douglas* framework for the reasons set forth in *Brown*. 2020 WL 42083, at *8. Here, however, because the Court finds that plaintiff fails to make out a prima facie case on his wrongful termination claim, the Court's analysis does not advance to the stage at which a burden-shifting analysis may be implicated, and the Court therefore need not determine whether to continue to adhere to the *McDonnell Douglass* burden-shifting framework.

Here, there is no evidence that plaintiff's Hotline complaints nor his October 7 and 8 communications with OSHA led to his suspension or termination, other than the temporal proximity between the two events. The Iowa Supreme Court has held that "the timing between the protected activity and the discharge is insufficient, by itself, to support the causation element of the tort." *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 768 (Iowa 2009) (citing *Hulme v. Barrett*, 480 N.W.2d 40, 43 (Iowa 1992); *see also Strehlow v. Marshalltown Cmty. Sch. Dist.*, 275 F. Supp. 3d 1006, 1022-23 (S.D. Iowa 2017); *Brandes v. City of Waterloo*, No. 18-CV-2089-KEM, 2020 WL 4209055, at *17 (N.D. Iowa July 22, 2020). Plaintiff has failed to point to sufficient evidence to generate a jury question as to whether plaintiff's workplace safety complaints were the "determining factor" causing his suspension. Thus, the Court **grants** defendant's motion for summary judgment as to Count IV of plaintiff's complaint.

## VI. CONCLUSION

For the foregoing reasons, the Court **grants** defendant's motion for summary judgment on all counts. Judgment shall enter on behalf of defendant.

**IT IS SO ORDERED** this 20th day of February, 2024.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa